# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**UNITED STATES OF AMERICA**
    **Plaintiff,**

  v.                        Case No. 14-CR-230

**ADAM MEYER**
    **Defendant.**

## DECISION AND ORDER

Defendant Adam Meyer moves for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). For the reasons that follow, I deny his motion.

## I. FACTS AND BACKGROUND

The government charged defendant with fraud and extortion arising out of a scheme he devised to obtain money from a wealthy Wisconsin businessman ("Victim A") and others. Defendant operated a business called Real Money Sports, which sold gambling advice to customers, promoting the company through his website, as well as by advertising, appearing on television and radio programs, and cold-calling customers. He described his system as "sports investing," claiming that it was safer than either traditional sports betting or financial investing. He made a number of false representations in order to induce people to buy picks from him relating to his significant winning percentage, the sports experts he supposedly had working for his company, and his supposed access to inside information on things like player injuries and changes to starting lineups. He also steered clients to make bets with his "runners" in Las Vegas or with people he falsely claimed were in the business of accepting bets on sporting events; the purported third parties were actually associates, working on defendant's

behalf. To help carry out this aspect of his scheme, defendant and his associates used alter egos and "spoofed" phone numbers while posing as third-party bookmakers.

Defendant began selling picks to Victim A in 2007. He also steered Victim A to bet on games and referred him to people defendant falsely represented as third-party bookmakers.

In 2009, when Victim A reduced his gambling activity, defendant devised a new component to his scheme, telling Victim A that his life was being threatened by a bookie to whom defendant owed a large gambling debt. Defendant falsely told Victim A the bookie believed defendant and Victim A were gambling partners and the bookie was holding them equally responsible for the debt. To lend credibility to his scheme, defendant frequently called Victim A posing as "Kent Wong," adopting what defendant thought was a Chinese accent, pressuring Victim A to pay the gambling debt. In response to these threats and demands, Victim A wired millions of dollars into accounts as directed by defendant, which defendant used for a variety of purposes.

In early 2012, Victim A told defendant he would not send any more money. Defendant subsequently arranged a meeting with Victim A under the false pretense that defendant would repay some of the money; the actual purpose of the trip was to extort more money. Defendant recruited a man named Ray Batista to fly with him from Florida to Wisconsin, promising him a share of the money. On April 16, 2012, defendant and Batista flew from Florida to Wisconsin to meet with Victim A. They met in a parking lot in the Eastern District of Wisconsin. Victim A was seated in the front driver's seat of his car. Defendant got into the front passenger seat and handed Victim A a Rolex watch, expressing his appreciation for the money Victim A had sent him over the past couple of years. Defendant then told Victim A to keep his head facing forward; Batista got into the backseat, took out a gun, and chambered a round of ammunition.

2

In response, Victim A agreed to pay around $10,000,000. Later that day, Victim A arranged for defendant to return to Victim A's office, where an employee of Victim A provided $200,000 in cash to defendant (which was apparently used to pay Batista). At defendant's later direction, Victim A wired $9.8 million between April 16, 2012, and April 24, 2012, into accounts identified by defendant.

Based on this conduct, defendant was charged with and later pleaded guilty to wire fraud, 18 U.S.C. § 1343, extortion, 18 U.S.C. § 1951, and travel to commit a crime of violence, 18 U.S.C. § 1951. The pre-sentence report ("PSR") calculated an advisory guideline range of 168-210 months based on an offense level of 34 and criminal history category of II. The PSR documented several prior convictions for similar conduct. In 1996, defendant was convicted in federal court in Louisiana of making threatening communications. In that case, an individual contacted the FBI and reported being threatened over the telephone by employees of a gambling service. Police were able to identify defendant as one of the individuals who threatened the victim.

In 2009, defendant was convicted in two consolidated wire fraud cases in federal court in Connecticut. In the first case, defendant defrauded a casino by presenting a number of fraudulent cashier's checks, causing a loss of $2.5 million. In the second, he defrauded four casinos in Las Vegas, again by presenting a number of fraudulent cashier's checks, totaling close to $6,000,000. He received probation in those cases, which he was able to complete. However, it was later discovered that he had engaged in part of the instant offense conduct while on probation. He also had problems on bond in this case, leading to detention.

At sentencing, the government recommended 144 months in prison, while defendant asked for 60 months. On consideration of the 18 U.S.C. § 3553(a) factors and the arguments

of the parties, I found a sentence between those recommendations appropriate.

In assessing the seriousness of the offense, I first noted its size: $45 million overall and a $10 million extortion. I also considered the lengths to which defendant went to extract money from Victim A, including taking on the fictitious identity of Kent Wong and culminating in the threatening meeting in which Batista racked a gun behind Victim A's head. These were no doubt terrifying events, and both parties acknowledged that they required a significant prison term to provide just punishment. The primary motives of the scheme appeared to have been funding a lavish lifestyle and supporting defendant's gambling habit.

I did take into account the unusual nature of the case, which began when Victim A, who was apparently wagering at significant levels, took on defendant as his adviser. Their relationship, at least initially, appeared to be complex and complicated personally and financially. I also took into account the impact of defendant's own serious gambling and substance abuse problems. See United States v. Dikiara, 50 F. Supp. 3d 1029 (E.D. Wis. 2014) (discussing how addiction can mitigate culpability).

In considering the need to protect the public and to deter, I noted that defendant had been in federal court twice before, receiving lenient sentences largely served in the community, which did not suffice to keep him from breaking the law. The extensive, ongoing nature of the conduct, and the various means used to carry out the scheme, also suggested a danger to the public.

However, I did take into account that defendant had not been to prison before. Generally, a lesser period of imprisonment is required to deter a defendant not previously subject to lengthy incarceration than is necessary to deter a defendant who has already served serious time yet continues to re-offend. See United States v. Qualls, 373 F. Supp. 2d 873, 877

4

(E.D. Wis. 2005).

Balancing these factors, I found a sentence of 96 months sufficient but not greater than necessary to satisfy the purposes of sentencing. This sentence accounted for the serious and ongoing nature of the offense, and the need to protect the public and deter, while acknowledging the factors somewhat mitigating defendant's culpability and the fact that he had not been to prison before.

Defendant is currently serving his sentence at FCI Miami, with a projected release date of March 7, 2022. However, defendant indicates that he has been notified that he is scheduled to be released to a halfway house up to 12 months before his official release date, i.e., in March 2021.[1] (R. 141 at 1.)

On August 19, 2020, defendant filed the instant motion for compassionate release. The government responded and defendant replied. The government then filed a motion for leave to supplement its response, adding recent allegations of prison disciplinary violations. (R. 146.) Defendant objects to the supplement, indicating that the allegations are unsubstantiated and asking that the court decide the motion based on the previous submissions. (R. 147.) It is unnecessary to resolve this dispute, as defendant's motion fails regardless.

## II. DISCUSSION

**A.   Compassionate Release Standards**

Pursuant to the First Step Act of 2018, the district may grant what is commonly known as "compassionate release." The statute provides, in pertinent part:

[T]he court, upon motion of the Director of the Bureau of Prisons, or upon motion

---

[1]In a supplement, defendant indicates that he has been recommended for 9 months or more of RRC time. (R. 145.)

of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—

(i) extraordinary and compelling reasons warrant such a reduction . . .

and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

18 U.S.C. § 3582(c)(1)(A)(i).

The statute contains three requirements: (1) the defendant must first make a request to the warden before applying to the court;[2] (2) the defendant must then demonstrate to the court that "extraordinary and compelling reasons" warrant a reduction in his sentence; and (3) the court must determine whether, even if such reasons are shown, a reduction of the sentence would be inconsistent with the applicable § 3553(a) factors and the need to protect the public. See United States v. Rodriguez, 424 F. Supp. 3d 674, 680 (N.D. Cal. 2019).

The statute does not define the term "extraordinary and compelling reasons." Rather, Congress instructed the Sentencing Commission, in promulgating general policy statements regarding the sentence modification provisions in § 3582(c)(1)(A), to describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples. See 28 U.S.C. § 994(t).[3] The Commission's

---

[2]In United States v. Scott, No. 17-CR-156, 2020 U.S. Dist. LEXIS 85554, at *9-16 (E.D. Wis. May 15, 2020), I determined that this "exhaustion" requirement is not jurisdictional and may in some cases be waived or excused.

[3]Congress did state that: "Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." Id.

6

policy statement provides:

> Upon motion of the Director of the Bureau of Prisons under 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment (and may impose a term of supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment) if, after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable, the court determines that—
>
> (1)   (A) extraordinary and compelling reasons warrant the reduction . . .
>
> (2) the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g); and
>
> (3) the reduction is consistent with this policy statement.

U.S.S.G. § 1B1.13. The commentary to the policy statement indicates that extraordinary and compelling reasons exist under these circumstances:

> (A) Medical Condition of the Defendant.—
>
> > (i) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
> >
> > (ii) The defendant is—
> >
> > > (I) suffering from a serious physical or medical condition,
> > >
> > > (II) suffering from a serious functional or cognitive impairment, or
> > >
> > > (III) experiencing deteriorating physical or mental health because of the aging process,
> >
> > that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.
>
> (B) Age of the Defendant.—The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

7

      (C) Family Circumstances.—

           (i) The death or incapacitation of the caregiver of the defendant's minor child or minor children.

           (ii) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

      (D) Other Reasons.—As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

U.S.S.G. § 1B1.13 cmt. n.1.

The Commission has not updated the policy statement, which purports to require a motion from the director of the Bureau of Prisons, see U.S.S.G. § 1B1.13 cmt. n.4, since the passage of the First Step Act, which allowed defendants to bring their own motions. As a result, many district judges "have concluded that, after the First Step Act, the Commission's policy statement does not constrain a court's independent assessment of whether extraordinary and compelling reasons warrant a sentence reduction under § 3582(c)(1)(A)." United States v. Somerville, No. 2:12-CR-222-NR, 2020 U.S. Dist. LEXIS 93935, at *15 (W.D. Pa. May 29, 2020). In Scott, 2020 U.S. Dist. LEXIS 85554, at *17-18, I adopted this position. See also United States v. Brooker, No. 19-3218-CR, 2020 U.S. App. LEXIS 30605, at *20 (2d Cir. Sept. 25, 2020) ("[T]he First Step Act freed district courts to consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release. Neither Application Note 1(D), nor anything else in the now-outdated version of Guideline § 1B1.13, limits the district court's discretion.").

Giving the statutory terms their ordinary meaning, a defendant seeking compassionate release would need to demonstrate that his situation is extraordinary, i.e., beyond what is usual,

8

customary, regular, or common, and his need for release compelling, i.e., irreparable harm or injustice will result if relief is not granted. Scott, 2020 U.S. Dist. LEXIS 85554, at *20; see also United States v. Ramirez, No. 17-10328, 2020 U.S. Dist. LEXIS 83363, at *6 (D. Mass. May 12, 2020) (indicating that U.S.S.G. § 1B1.13 provides helpful guidance on the factors that might support compassionate release, although it is not ultimately conclusive). In the context of the COVID-19 pandemic, courts have found that modification may be warranted if the prisoner demonstrates that he is particularly vulnerable to the virus based on his age, health conditions, or other specific circumstances; on the other hand, courts have tended to deny compassionate release requests based on general concerns about possible exposure in prison. E.g., United States v. Dover, No. 14-CR-196, 2020 U.S. Dist. LEXIS 133340, at *16-17 (E.D. Wis. July 28, 2020); see also United States v. Thomas, No. 1:11-CR-22, 2020 U.S. Dist. LEXIS 172963, at *6-7 (N.D. Ind. Sept. 22, 2020) (explaining that § 3582(c)(1)(A) contemplates a sentence reduction based on the particular circumstances of where the defendant is housed and his personal health conditions).

Finally, if the court decides that extraordinary and compelling reasons have been shown, it must also consider the applicable § 3553(a) factors to determine whether the sentence should be modified. Those factors include: (1) the nature and circumstances of the offense, and the history and characteristics of the defendant; (2) the need for the sentence imposed to provide just punishment, deterrence, protection of the public, and correctional treatment; (3) the kinds of sentences available; (4) the sentencing guideline range; (5) any pertinent policy statement issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities; and (7) the need to provide restitution to the victims of the offense. 18 U.S.C. § 3553(a). In some cases, a court may find that the relevant § 3553(a) factors outweigh the

extraordinary and compelling reasons warranting compassionate release and/or that release would undermine the goals of the original sentence. United States v. Black, No. 1:11-cr-00083, 2020 U.S. Dist. LEXIS 142523, at *11 (S.D. Ind. Aug. 10, 2020); United States v. Bartlett, No. 06-CR-273, 2020 U.S. Dist. LEXIS 101393, at *13-14 (E.D. Wis. June 9, 2020). The court must also consider whether release would pose "a danger to the safety of any other person or to the community." U.S.S.G. § 1B1.13(2).

**B. Analysis**

### 1. Exhaustion

Defendant's father submitted a request for compassionate release to the warden at FCI Miami on July 10, 2020. (R. 141 at 3; R. 141-2.) No action has been taken on the request, and more than 30 days have passed. I will accordingly find that the statute's exhaustion requirement is satisfied and address the motion on the merits.[4]

### 2. Extraordinary and Compelling Reasons

On the merits, defendant relies on the COVID-19 pandemic, arguing that his risk of severe illness is elevated because "he suffers from pre-diabetes, obesity, and has suffered from hypertension and a leaky heart valve." (R. 141 at 3.) He further notes that he experienced a knee injury in June 2018, for which he underwent surgery on March 11, 2020. (R. 141 at 3-4; R. 141-1 at 1-3, 6-7, 9-10.) He indicates that he has not received physical

---

[4]BOP regulations permit another person to request release on the inmate's behalf. See 28 CFR § 571.61(b). In its response, the government notes that some courts have nevertheless required a first-person request to the warden. (R. 143 at 3.) The government further notes that the grounds for relief presented in the motion filed with the court differ from those presented to the warden, which frustrates the purpose of exhaustion. (R. 143 at 4.) Ultimately, however, the government contends that the motion fails to demonstrate extraordinary and compelling grounds for release. (R. 143 at 4.) As noted above, the exhaustion requirement is not jurisdictional.

10

therapy due to BOP restrictions during the pandemic, which limit medical movement and treatment except for life-threatening conditions. (R. 141 at 4.) This has, he continues, led to his leg remaining severely inflamed with scar tissue building up, staph infections, and the possibility of blood clots forming. However, he concedes that he does not have medical records to confirm this information, instead conveying what he has been told by BOP medical staff. (R. 141 at 4.)

Defendant does cite BOP medical records documenting lab results suggesting pre-diabetes. (R. 141 at 4; R. 141-1 at 5, 8.) He further notes that he qualifies as obese under CDC guidelines, standing 6'3" tall and weighing 240 to 245 pounds.[5] (R. 141 at 4.) He also cites a letter from a physician who treated him before his incarceration, which states that defendant "suffers from a leaky heart with hypertension and obesity." (R. 141-3.) The letter further states that recent blood sugar tests were in the pre-diabetic and diabetic ranges. The letter concludes that defendant is a "high-risk patient, and avoiding exposure to COVID infection would be a high priority. I would recommend early release to diminish risk to any COVID infections which might be at high prevalence in any institutional facility."[6] (R. 141-3.)

---

[5] In making this claim, defendant relies on the 2017 PSR, which listed a height of 6'3" and weight of 240 pounds. (PSR ¶ 90.) Those measurements produce a BMI of 30.0, right at the line for obesity. See https://www.nhlbi.nih.gov/health/educational/lose_wt/BMI/bmicalc.htm (last visited October 26, 2020).

[6] Defendant also attaches a letter from his father's doctor, indicating that the father suffers from end stage renal disease. The letter states: "Mr. Meyer has requested his medical information be shared in consideration for compassionate release for his son, Adam Meyer." (R. 141-4.) However, defendant does not in his motion develop an argument for release based on family circumstances. Defendant further notes a family history of kidney failure, heart disease, and cancer. (R. 141 at 5 n.5.) However, he makes no claim that he suffers from any of these conditions, nor does he develop an argument that they otherwise support his request for compassionate release.

11

Defendant contends that he suffers from a number of conditions identified by the CDC as placing him at greater risk of severe illness from COVID-19. He also relies on the CDC's statements regarding the risks experienced by incarcerated persons, who live, work, eat, and recreate within congregate environments and cannot engage in social distancing and other hygienic measures designed to reduce transmission. (R. 141 at 5, citing United States v. Ramsey, No. 18-CR-163, 2020 U.S. Dist. LEXIS 118681, at *9 (E.D. Wis. July 7, 2020) (discussing CDC guidance).)

Defendant further contends that FCI Miami has experienced a COVID-19 outbreak, with the third highest number of positive inmates (as of the time the motion was filed). (R. 141 at 5.) He also cites a statement from a prison union official expressing concern about the situation there. (R. 141 at 6.)

Defendant concludes that his medical conditions, combined with the grave risk he faces at FCI Miami, support his request for release. (R. 141 at 7.) He cites a number of cases in which courts granted release to inmates with similar conditions, e.g., obesity, hypertension, and pre-diabetes. (R. 141 at 7.)

As the government notes in response, the precise nature of defendant's claim is hard to pin down. (R. 143 at 3-5.) The request from defendant's father to the warden relied on the lack of physical therapy for defendant's knee, staph infections, and "costochondritis" (a condition that results in chest pain and can be worsened by respiratory infections).[7] (R. 143

---

[7]Costochondritis, sometimes known as chest wall pain, is an inflammation of the cartilage that connects a rib to the breastbone (sternum). Pain caused by costochondritis might mimic that of a heart attack or other heart conditions. Costochondritis usually goes away on its own, although it might last for several weeks or longer. Treatment focuses on pain relief. https://www.mayoclinic.org/diseases-conditions/costochondritis/symptoms-causes/syc-20371175 (last visited October 26, 2020).

12

at 3-4; R. 141-2.) However, in the motion filed with the court, defendant relies on four completely different conditions: pre-diabetes, obesity, hypertension, and a leaky heart valve. He mentions his knee injury, but he develops no argument that this injury or any resulting complications provide a basis for compassionate release.

As the government also notes, based on the records and letters submitted, the only diagnosis recently made relates to defendant's knee injury. (R. 143 at 5.) The letter from Dr. Schertzer references a leaky heart valve, hypertension, and obesity, as well as blood sugar readings in the pre-diabetic and diabetic ranges. However, Dr. Schertzer has not treated defendant in more than 5-½ years. (R. 143 at 5.) The PSR, completed in 2017, referenced an enlarged prostate, overactive bladder, and allergies, for which defendant took medications. (PSR ¶ 90.) At that time, defendant "denied any other on-going medical issues and did not recall ever being hospitalized." (PSR ¶ 90.) Finally, the government notes that the letter from Dr. Schertzer does not explain the basis for his conclusions, e.g., prior treatment, review of more recent records, or information provided to him by defendant. (R. 143 at 6.)

It is hard to see how the identified conditions, alone or in combination, qualify as extraordinary and compelling.

**Pre-diabetes.** Defendant contends in reply that the BOP records confirm the pre-diabetes diagnosis, which is further confirmed by Dr. Schertzer. (R. 144 at 3.) The problem is that pre-diabetes has not been recognized by the CDC as a condition that increases the risk of severe illness from COVID-19, as numerous courts have noted. See, e.g., United States v. Pena, No. 10-CR-905-LTS, 2020 U.S. Dist. LEXIS 193089, at *8 (S.D.N.Y. Oct. 19, 2020) ("[P]re-diabetes is not on the CDC's lists of health conditions that elevate, or may possibly elevate, the risks of contracting or suffering severe manifestations of COVID-19."); United

13

States v. Davis, Nos. 19-5; 19-129, 2020 U.S. Dist. LEXIS 163002, at *7-8 (W.D. Pa. Sept. 8, 2020) ("The CDC indicates that persons with Type 2 diabetes are at an increased risk of severe illness from the virus, and persons with Type 1 diabetes may be at increased risk, but the CDC does not address persons with borderline diabetes or prediabetes."); United States v. McKee, No. 18-219 (PAM), 2020 U.S. Dist. LEXIS 161987, at *3 (D. Minn. Sept. 4, 2020) ("The CDC notes that diabetes is an elevated risk factor for COVID-19, but there is no indication prediabetes poses a similar threat."); United States v. Snell, No. CCB-17-602, 2020 U.S. Dist. LEXIS 127310, at *5 (D. Md. July 20, 2020) ("According to the Centers for Disease Control ('CDC'), while diabetes is an underlying condition that increases an individual's vulnerability to COVID-19, prediabetes is not."); United States v. Hazam, 2020 U.S. Dist. LEXIS 105723, at *6 (C.D. Ill. June 16, 2020) ("While the CDC recognizes diabetes as a comorbidity that may increase the risk of serious injury or death from COVID-19, the same is not true of prediabetes.").[8] Defendant presents no specific evidence that his high blood sugar levels, alone or in combination with other conditions, have any effect on his health. See United States v. Lopez-Ontiveros, No. 15-cr-575-GPC-1, 2020 U.S. Dist. LEXIS 185301, at *7-8 (S.D. Cal. Oct. 6, 2020) ("The Court notes that hyperlipidemia, prediabetes, and anxiety are not conditions listed by the CDC as potentially increasing the risk of serious illness from COVID-19, and Lopez-Ontiveros does not support his assertion that these conditions increase his risk.").

---

[8]While defendant cites a number of decisions referencing pre-diabetes (R. 141 at 7), it does not appear that any of them granted compassionate release based on this condition alone. For instance, in United States v. Blye, 2020 WL 3064225, at *4 (W.D. Wash. June 9, 2020), the prisoner suffered "from multiple health issues," including respiratory disorders, hypertension, and a possible heart murmur, in addition to pre-diabetes. And in United States v. Readus, 2020 WL 2572280, at *2-3 (E.D. Mich. May 21, 2020), the prisoner had "four underlying conditions," including severe obesity (with a BMI over 50), severe obstructive sleep apnea, hypertension, and pre-diabetes.

14

**Obesity**.  While the CDC has recognized that obesity, defined as a BMI of 30 or more, increases the risk of severe illness from COVID-19, defendant's evidence on this point is weak. Defendant indicates in reply that his obesity diagnosis is confirmed in the PSR and again by Dr. Schertzer.  (R. 144 at 3-4.)  However, he points to no evidence more recent than 2017 establishing his BMI, and he presents no evidence from any time suggesting that his weight has caused him any problems.  Further, the height and weight documented in the PSR just barely reach the BMI "obesity" threshold.[9]  Finally, as one court has noted, while the CDC has identified obesity as a factor that puts an individual at an increased risk for severe illness from COVID-19, BMI alone provides little insight into a prisoner's physical condition.  United States v. Tranter, No. 1:17-CR-22-HAB, 2020 U.S. Dist. LEXIS 119224, at *8 (N.D. Ind. July 8, 2020). "BMI is a notoriously blunt tool with 'clinical limitations,' including its inability to differentiate between excess fat, muscle, and bone mass."  Id. (citing CDC materials on BMI).  Here, as in Tranter, defendant "has identified no current medical issues resulting from his obesity, [suggesting] that it has little adverse effect on his overall health."  Id. at *8-9; see also United States v. Gonzalez, No. 3:15-cr-00223 (MPS), 2020 U.S. Dist. LEXIS 178525, at *5-6 (D. Conn. Sept. 29, 2020) (denying compassionate release to pre-diabetic prisoner who barely qualified as obese); United States v. Milchin, No. 17-00284-1, 2020 U.S. Dist. LEXIS 138357, at *4 (E.D.

---

[9]I note that the CDC recently added being "overweight"—a BMI of 25 to 30—to the list of conditions that "might" create an increased risk of severe illness from COVID-19. https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-co nditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-n cov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html#obesity (last visited October 26, 2020).  Nearly 3/4 of the American people are either obese or overweight, see Roni Caryn Rabin, Extra Pounds May Raise Risk of Severe Covid-19, N.Y. Times, Oct. 10, 2020, so it may be difficult for a court to conclude that such a condition, without more, will qualify as unusual or extraordinary for purposes of compassionate release.

15

Pa. Aug. 4, 2020) ("Absent any evidence of other risk factors, Milchin's slight obesity and elevated cholesterol are not enough to justify releasing him.").

**Hypertension/Heart problems**. Defendant contends that his "history of hypertension and a leaky heart valve is also confirmed by Dr. Schertzer." (R. 144 at 4.) As this phrasing indicates, defendant presents no evidence that he currently suffers from these conditions. The recent BOP medical records do not mention heart problems or hypertension.[10] Moreover, while the CDC lists heart failure, coronary artery disease, cardiomyopathies, and pulmonary hypertension as conditions that increase the risk of severe illness, and further notes that other cardiovascular or cerebrovascular disease, such as hypertension (high blood pressure) or stroke, may increase the risk of severe illness from COVID-19,[11] the CDC has not identified a "leaky heart valve" as a problematic condition. Finally, Dr. Schertzer gives no indication in his letter as to what sort of hypertension defendant experienced or how severe it is/was. See United States v. Jarvis, No. 1:94CR68, 2020 U.S. Dist. LEXIS 146846, at *6 (N.D. Ohio Aug. 14, 2020) (noting that there are differences in severity and type of hypertension that affect a person's vulnerability to developing a serious illness from COVID-19).

I have also considered the conditions at defendant's facility. According to the most recent figures from FCI Miami, the situation there may be stabilizing, with 7 inmates positive,

---

[10]The recent BOP records document blood pressure readings of 126/74, 125/65, 113/60, and 120/72. (R. 141-1 at 7, 9, 10.)

[11]https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html#heart-conditions (last visited October 26, 2020).

16

23 staff positive, 121 inmates recovered, and 13 staff recovered.[12] Defendant does not in his reply submissions argue otherwise.

In sum, while defendant's medical history includes conditions that might in some cases support compassionate release, he fails to present specific evidence demonstrating that the risk he faces is extraordinary and the need for release compelling. In any event, even if defendant could make such a showing, I would find that the § 3553(a) factors outweigh the reasons presented in support of compassionate release.

### 3. Section 3553(a) Factors

Defendant contends that the offense was "largely non-violent"; he pleaded guilty and accepted responsibility; his prior record is relatively limited, with no previous prison sentences; he enjoys family support; he is in a stable relationship, with a stable home available on release; and he has avoided discipline and completed programming in prison. (R. 141 at 8-10; R. 141-5; R. 141-6.) As the government notes in its response, however, defendant engaged in a years-long scheme in this case, which caused millions of dollars of losses and involved elaborate efforts to deceive, coerce, intimidate, and threaten, including the use of a firearm. (R. 143 at 6.) While defendant's criminal history score was low, he had three prior federal felony convictions, and he committed the instant offense while on federal probation. (R. 143 at 7-8.) Given these circumstances, a reduced sentence would fail to provide just punishment, promote respect for the law, protect the public, and deter future crimes.

I have also considered defendant's contentions regarding his prison conduct. While rehabilitative efforts <u>alone</u> will not support compassionate release, the court may take such

---

[12]htttps://www.bop.gov/coronavirus/ (last visited October 26, 2020).

efforts into account as part of the analysis. See United States v. Anderson, No. 14-CR-186, 2020 U.S. Dist. LEXIS 187983, at *13 (E.D. Wis. Oct. 8, 2020). However, defendant makes no showing that his efforts have been unusual or extraordinary or that they otherwise support modification of his sentence.

Finally, defendant notes in reply that he has now served more than 80% of the prison term, his first such sentence, which is sufficient to deter him. He further contends that he has already been significantly punished. (R. 144 at 2.) While the amount of time served/remaining is also a relevant consideration, reducing the sentence imposed here, already significantly below the term recommended by the guidelines, would undermine the goals of the original sentence.

### III. CONCLUSION

**THEREFORE, IT IS ORDERED** that defendant's motion for compassionate release (R. 141) is denied.

**IT IS FURTHER ORDERED** that the government's motion for leave to supplement (R. 146) is denied as moot.

Dated at Milwaukee, Wisconsin, this 27th day of October, 2020.

/s Lynn Adelman
LYNN ADELMAN
District Judge

18